# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

**OSHANE N. MALCOLM,**

　　　　**Plaintiff,**

**vs.**　　　　　　　　　　　　　　　　**Case No. 4:17cv301-RH-MAF**

**L. CARTER, et al.,**

　　　　**Defendants.**

_____/

## SECOND REPORT AND RECOMMENDATION[1]

　　　　Defendants Carter, Chisholm, Hewitt, and Langston filed a motion for summary judgment, ECF No. 75, on June 22, 2020.  The pro se Plaintiff was advised of his obligation to respond to the Defendants' motion, ECF No. 77, and granted an extension of time in which to comply.  ECF No. 87. Furthermore, Plaintiff filed his own motion for summary judgment, ECF No. 80, but was granted additional time in which to properly file an affidavit or declaration as a supplement to his summary judgment motion.  ECF No.

---

[1] A Report and Recommendation, ECF No. 38, was previously entered in this case which recommended dismissing the claims brought against the Defendants in their official capacities, but otherwise denying the motion to dismiss, ECF No. 30.  That recommendation was adopted.  ECF No. 45.

84.[2]  On August 3, 2020, Plaintiff filed his declaration, ECF No. 89, and he

recently filed his opposition to Defendants' motion, ECF No. 92, along with

a separate statement of disputed facts, ECF No. 93.

Defendants filed a motion for clarification of deadlines, ECF No. 91,

which was granted, ECF No. 94, and Defendants have filed thier reply to

Plaintiff's response to Defendants' summary judgment motion.  ECF No.

95.  The motions are ready for a ruling.

## I.    Plaintiff's Complaint, ECF No. 20

Plaintiff alleged that after he was attacked by members of a gang, he

requested protective management status from Defendant Carter because

he did not feel safe.  ECF No. 20 at 4.  Defendant Carter allegedly did

nothing.  *Id.*  At a subsequent disciplinary hearing, Plaintiff again reported

his fear of further attack if he were put back in general population, but

again, Defendants Chisholm and Langston failed to take any action on his

behalf.  After Plaintiff was released to general population, he was assaulted

---

[2] Although Plaintiff was informed that "filing his own motion [did] not relieve him of
the obligation to respond to the Defendants' motion," *see* ECF No. 82 at 4, Plaintiff filed
only one document.  ECF No. 80.  In it, Plaintiff requests that Defendants' motion be
denied, *see* ECF No. 80 at 5 at 7, and that his motion be granted.  *Id.* at 11.  Because
Plaintiff is pro se in this case, leniency is warranted and Plaintiff's "motion" is construed
to be his response to Defendants' motion, and his own summary judgment motion.

twice more.  *Id.* at 7.  Plaintiff said that Defendant Hewitt "just stood there" watching as Plaintiff was hit by a gang member, telling him "to 'man up'" and taking no action to protect him.  *Id.*

## II.    Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must

then show[3] the court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554.

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). A party must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)).

---

[3] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Case No. 4:17cv301-RH-MAF

"Summary judgment is not a time for fact-finding; that task is reserved for trial." <u>Sconiers v. Lockhart</u>, 946 F.3d 1256, 1263 (11th Cir. 2020) (citing <u>Tolan v. Cotton</u>, 572 U.S. 650, 655-57, 134 S. Ct. 1861, 188 L. Ed. 2d 895 (2014)).  Specific facts pled in a sworn complaint and supported by record evidence must be credited to the Plaintiff, and all reasonable inferences must be resolved in the light most favorable to the nonmoving party. <u>Sconiers</u>, 946 F.3d at 1262-63.  However, "when competing narratives emerge on key events, courts are not at liberty to pick which side they think is more credible."  946 F.3d at 1263.  On the other hand, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 587 (internal quotation marks omitted) (quoted in <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 249, 106 S. Ct. at 2511 (quoted in <u>Sears v. Roberts</u>, 922 F.3d 1199, 1205 (11th Cir. 2019)).

"Cross motions for summary judgment do not change the standard."

Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic &

Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007) (quoted in Ernie Haire

Ford, Inc. v. Universal Underwriters Ins. Co., 541 F. Supp. 2d 1295, 1297

(M.D. Fla. 2008).  "'Cross motions for summary judgment are to be treated

separately; the denial of one does not require the grant of another.'"

Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d

1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608

F.2d 431, 433 (10th Cir. 1979)) (quoted in Ernie Haire Ford, 541 F. Supp.

2d at 1297-98)).  Thus, each motion for summary judgment has been

separately evaluated.

## III.   Relevant Evidence

### A.   Plaintiff's Evidence

Plaintiff submitted a declaration, ECF No. 89, testifying that in May

2016, he was housed at Franklin Correctional Institution, F-dormitory, wing

2.  *Id.* at 2.  Inmates affiliated with a gang entered the dorm and gestured

for Plaintiff to go to the restroom "to discuss business of some type."  *Id.*

When Plaintiff entered the restroom, he was surrounded by three or four

inmates, shoved against the wall, and Plaintiff was told that he was to

provide money and sexual favors.[4]  *Id.*  While one inmate held a "shank" to

Plaintiff's neck, a second inmate took a broom and began attempting to

penetrate Plaintiff with it.  *Id.*; *see also* ECF No. 20 at 3.  Plaintiff

instinctively began to wrestle away from the inmates and the altercation

moved out of the restroom and into the dormitory.  ECF No. 89 at 2-3.

Defendant Carter arrived to restore order, separating the inmates,

and placing Plaintiff in handcuffs.  *Id.* at 3.  Defendant Carter escorted

Plaintiff to the medical building and Plaintiff told her what happened,

expressing fear for his safety "from the particular inmate 'gang'" and

requesting protective management.  *Id.* at 4.  Defendant Carter "made no

reply."  *Id.*  After Plaintiff was examined by the nurse and Defendant Carter

was escorting him to administrative confinement, Plaintiff again "reiterated"

his "concerns and fears from the incident involving inmate gang members

and the need for protective management."  *Id.*  Defendant Carter told

Plaintiff that she would look into it, but she did not do so.  *Id.*

---

[4] Plaintiff's complaint more clearly alleged that the "gang members attempted to extort" him and "sexually assault him at the same time."  ECF No. 20 at 2.  Plaintiff's complaint was not, however, sworn under penalty of perjury, and his "unnotarized oath" was unsigned.  *Id.* at 12.

Plaintiff said that some of the same gang members who were involved in the altercation were housed "in the same confinement wing" with him.[5]  ECF No. 89 at 4.  He also said that over several days, he heard the gang members make threats and assaults on his life.  *Id.*

On May 31, 2016, Plaintiff was given a disciplinary report for fighting, and the investigating officer provided Plaintiff with a witness statement form.  *Id.* at 4-5.  Plaintiff completed the form and wrote that he feared for his life.  *Id.* at 5.[6]  *See also* ECF No. 80 at 13.

Plaintiff's disciplinary hearing was held on June 2, 2016, in front of Defendants Langston and Chisholm.  *Id.*  After being read the charge, Plaintiff pleaded "no contest" to the disciplinary report.  *Id.*  Defendant Chisolm then asked Plaintiff if he still wanted protection and Plaintiff replied "yes."  *Id.*

Plaintiff was found guilty of the fighting charge and sentenced to 30 days in disciplinary confinement.  ECF No. 89 at 5.  He was released from confinement back to open population, despite objecting to the confinement

---

[5] The unsworn complaint alleged that one gang member "was housed in a cell right next to" Plaintiff.  ECF No. 20 at 5.

[6] Plaintiff's statement was also submitted with Defendants' evidence, ECF No. 75-3 at 3, and is quoted on page 13 of this Report and Recommendation.

officers.[7]  *Id.*  After entering his assigned housing, Plaintiff was approached by another inmate who told him that various gang members were "talking about getting" Plaintiff.  *Id.*  Plaintiff said that for several weeks, he was looking over his shoulder and trying to protect himself.  *Id.*

On July 8, 2016, while in the dining hall, Plaintiff was approached by one of the gang members who "cold cocked" Plaintiff in the face.  ECF No. 89 at 6.  Plaintiff alleged that a female correctional officer saw what happened, but "looked away as to signify that she saw nothing."  *Id.*  Plaintiff exited the dining hall and seeing Defendant Hewitt, Plaintiff advised the Defendant of what had just occurred.  *Id.*  Defendant Hewitt told Plaintiff to "man-up."  *Id.*  Plaintiff declares, "[a]nd man-up I did."  *Id.*

Plaintiff returned to his assigned dormitory and obtained a "homemade 'shank'" and "proceeded to confront the gang members' 'hit man' as he is referred to" in an "attempt to ultimately secure" Plaintiff's safety.  *Id.* at 6.  Plaintiff admits that the confrontation led to Plaintiff stabbing him, and then Plaintiff went to change clothes.  *Id.*  As he returned downstairs, other members of the gang had entered the dormitory.  *Id.*

---

[7] Plaintiff does not identify those officers and it does not appear that they are named as Defendants in this case.  ECF No. 89 at 5.

Plaintiff said that he pulled out his "shank" as the gang began surrounding him. *Id.* Plaintiff explains that "one of the gang members ran behind" him and stabbed him, then "kept running." ECF No. 89 at 6-7. When officers entered the wing, they took Plaintiff to the medical building for treatment, and then by ambulance to Tallahassee Memorial Hospital. *Id.* at 7.

Plaintiff declared it was "well known" that an unwritten policy existed which did not allow inmates to request protective management or "'check in,' as it is referred" to in the prison environment. *Id.* at 7. He avers that "it has been widely publicized at Franklin C.I., that various correctional officer [isc] would sometime [sic] supply an inmate with a knife (shank) or 'ice pick' in order that they will not 'check in.'" *Id.*[8]

## B.    Defendants' Evidence

Defendants submitted the "Daily Security Roster" for Franklin C.I. for Friday, July 8, 2016. Ex. A (ECF No. 75-1). That roster, although it is almost entirely redacted, shows that Defendant Kristi Hewitt's day off was July 8, 2016. Thus, Defendant Hewitt was not at work when Plaintiff said he interacted with this Defendant. ECF No. 75-1 at 2.

---

[8] Plaintiff does not explain the basis for that assertion, nor does he identify any Defendant or other person who supplied him with a shank.

Case No. 4:17cv301-RH-MAF

Defendants have shown that Plaintiff was transferred to Franklin

Correctional Institution on February 3, 2016.  Ex. B (ECF No. 75-2 at 1).

His housing assignment was in the F-dormitory, cell F2110U.  *Id.*  On May

26, 2016, Officer Kennedy (not a named Defendant) was in the officer's

station in F Dormitory.  Ex. E (ECF No. 75-5 at 3).  Officer Kennedy

observed Plaintiff having an altercation with inmate Joseph Herode.  *Id.*

The two inmates were "striking each other in the face and upper torso with

clinched fists."  *Id.*  Officer Kennedy saw three other inmates enter the

dorm and surround Plaintiff.  *Id.*  Plaintiff "began swinging a broom at the

other inmates and then produced a [homemade] weapon" he had retrieved

from his cell.[9]  *Id.*  Officer Kennedy called for assistance and after staff

arrived, the inmates were restrained and removed from the area.  *Id.* at 3-4.

An "incident report" was written, ECF No. 75-6 at 1, and an

investigation begun to identify the inmates involved and place them in

Administrative Confinement pending disciplinary action.  *Id.*; *see also* Ex. E

(ECF No. 75-5 at 3-4); Ex. F (ECF No. 75-6).  Plaintiff was assigned to cell

A-1210U in administrative confinement.  Ex. B (ECF No. 75-2 at 1).  After

---

[9] The weapon was confiscated and photographed.  ECF No. 75-3 at 4.

reviewing the camera footage, inmates Loussaint, Bacuvaris, and Toussaint were identified and placed in confinement awaiting completion of the investigation.  Ex. F (ECF No. 75-6 at 1).

Defendants contend that following the incident, the inmates "were separated for the safety and security of all involved" and placed in administrative confinement ["A.C."].[10]  ECF No. 75 at 5; *see also* Ex. J [ECF No. 75-10]).  The evidence shows Inmate Herode was initially placed in A.C. cell A1107L, and then moved to D.C. (disciplinary confinement) cell A3112L on June 2, 2016.  ECF No. 75-10 at 1.  After his release from confinement, inmate Herode was assigned to C1118U.  *Id.* at 2.

Inmate Loussaint was placed in A.C. cell A1109L.  *Id.* at 3.  A week later he was returned to open population, but on the following day he was returned to A.C., cell A1203U.  *Id.* at 3.  Upon his release from administrative confinement he was assigned to cell H1152s.

Inmate Toussaint was placed in A.C. cell A1201L.  *Id.* at 4.  He was released from administrative confinement a week later (on June 2, 2016),

---

[10] Defendants state that the inmates were "separated," and that is true to the degree they were not housed in cells together.  However, at least one inmate appears to have been in the cell next to Plaintiff.  *See* footnote 7.

but transferred to another institution on June 10, 2016.  *Id.*  Similarly,

inmate Baeugris was placed in A.C. cell A1211u, but released to open

population on June 2, 2016.[11]  *Id.* at 5.  He also was transferred to another

institution on June 10, 2016.  *Id.*

A disciplinary report was written charging Plaintiff with "fighting."  Ex.

C (ECF No. 75-3 at 1).  As part of the disciplinary hearing process, Plaintiff

was given an opportunity to provide a written statement.  *Id.* at 3.  His

statement, in its entirety, said:

> On 5/26/16 five dudes approch [sic] me with threats stating if I
> don't give them money every week of [illegible] they said they
> would make sure I got air lifted off the compond [sic] or they
> would just kill me right were [sic] I stood.  An hour later these
> same five dudes came to my dorm with weapons trying
> defended [sic] myself I would like this matter to be look into
> because I know my life is still in danger.

Ex. C (ECF No. 75-3 at 3).

Plaintiff entered a "no contest" plea to the fighting charge.  Ex. C

(ECF No. 75-3).  He was sentenced to 30 days of disciplinary confinement.

*Id.* at 1.  On June 2, 2016, Plaintiff was moved into disciplinary confinement

---

[11] Plaintiff was placed in A.C. cell A1210U on May 26, 2016.  Ex. B (ECF No. 75-2 at 1).  Presumably, that would be next to inmate Baeugris' cell.  Plaintiff was moved on June 2nd to A.C. cell A3207U, the same day inmate Baeugris was returned to open population.

cell A-3207U.  Ex. B (ECF No. 75-2 at 1).  On June 18, 2016, he was

moved to disciplinary confinement cell A3110U, and two days later, moved

to cell A3207U.  *Id.*  Later that same day (June 20, 2016), Plaintiff was

released to open population and assigned to B dormitory, cell B4214U.  Ex.

B (ECF No. 75-2 at 2).

On July 8, 2016, another altercation occurred involving Plaintiff and

two other inmates.  Exhibits G-H.  Officer Brannan reviewed the videotape

from B-dormitory, Plaintiff's assigned dorm, and provided a "statement of

facts" for the disciplinary report:  "While reviewing B dormitory quad 4 fixed

wing cameras, I observed Inmate Malcolm, Oshane DC#J56417 enter

secured cell B4-100 and strike inmate Jacques, Billy DC#B11736 with a

homemade weapon in the facial and upper torso area at approximately

7:09 AM."  Exhibit H (ECF No. 75-8 at 1); *see also* Exhibit I at 07:09.[12]

Officer Brannan concluded that Plaintiff was "in direct violation of" Rule 1-

10, aggravated battery or attempted aggravated battery on an inmate, and

Plaintiff was issued a disciplinary report.  ECF No. 75-8 at 1.

---

[12] The Court has reviewed the video evidence which reveals Plaintiff stabbed the
other inmate in an unprovoked attack.  Ex. I.

Additional video footage has been presented which reveals that shortly after 7:30 A.M., Plaintiff was suddenly stabbed in the back of his neck or shoulder when another inmate ran up behind Plaintiff, assaulted him, and then ran away.  Ex. I.  Investigation revealed that Plaintiff was attacked by inmate Jean Holybrice.  Ex. G (ECF No. 75-7 at 1); Ex. I at 7:32.  The Incident Report indicates that inmate Jacques (the inmate Plaintiff assaulted) and inmate Holybrice (the inmate who assaulted Plaintiff) were suspected members of the "Zoe Mafia Family."  ECF No. 75-7 at 1.

Following the attack, Plaintiff's "injuries were deemed life threatening."  ECF No. 75-7 at 1.  After being initially seen by medical staff, Plaintiff was "transported via EMS to receive outside medical treatment."  ECF No. 75-8 at 1.

Plaintiff was given a disciplinary report for "aggravated battery or attempt on an inmate."  ECF No. 75-8 at 1.  He entered a guilty plea to the charge and was found guilty on July 14, 2016.  ECF No. 75-8 at 1.  He was sentenced to 60 days in disciplinary confinement.  *Id.*

Defendants also submitted the declaration of Warden Scott Duval as evidence in which he explained that "the determination of whether an inmate at a particular institution is in need of protective management housing is made by the Institutional Classification Team ('ICT') with the final decision coming from the State Classification Office ('SCO') in Tallahassee." Ex. D (ECF No. 75-4 at 1) (citing FLA. ADMIN. CODE R. 33-602.221(1)(i) and (n)). An ICT typically is comprised of a "warden or assistant warden, classification supervisor, and chief of security." *Id.* at 1-2 (citation omitted). Warden Duval advised that "[t]he primary responsibility of any other officer of whom an inmate requests consideration for protective management is to ensure that the Officer-in-Charge is made aware of the situation." *Id.* at 2. After making the Officer-in-Charge aware, the inmate is "placed in confinement pending the determination of what additional steps may be necessary, [but] there are no other additional actions that an officer can take." *Id.* An officer lacks authority to "challenge or change the eventual determination . . . made by the administration." *Id.*

Inmates in confinement are able to make a request for protective management "from the duty wardens who make weekly rounds of the

confinement units, or from the officer-in-charge of a given shift . . . who

make rounds of the confinement units daily."  *Id.*  Warden Duval states that

"an inmate in confinement has numerous opportunities to seek protection

should they believe they are in danger."  *Id.* at 2-3.

## IV.   Analysis

Plaintiff claims are that the Defendants were made aware of threats

to Plaintiff's life and safety, but deliberately disregarded a substantial risk of

harm and failed to take action to protect him.  ECF No. 20 at 8.  He

contends the Defendants violated his Eighth Amendment right to be

protected from violence.  *Id.* at 9.  Plaintiff further claims that Defendants

violated the Federal Tort Claims Act and state common law by not

protecting him.  *Id.* at 9-10.

### 1.   Federal Tort Claim

The Federal Tort Claims Act "waives the United States' sovereign

immunity from suit in federal courts for its employees' negligence."  Foster

Logging, Inc. v. United States, No. 18-15033, 2020 WL 4931998, at *3

(11th Cir. Aug. 24, 2020) (citing 28 U.S.C. § 1346(b)).  Because the named

Defendants are not federal employees, this claim is insufficient on its fact.

Summary judgment should be granted in favor of the Defendants on this claim.[13]

## 2.    Defendant Hewitt

Defendant Hewitt has shown that she was not present on July 8, 2016, and could not be involved in the events at issue.  ECF No. 75-1.  Plaintiff does not dispute that assertion.  He does, however, contend that the wrong person named "Hewitt" was served with process in this case.  ECF No. 80 at 6-7.  Had Plaintiff engaged in discovery with Defendant Hewitt, he surely would have discovered that the wrong person was either named or served, and that could have possibly been corrected prior to summary judgment.  At this point, however, four years after the event at issue, it is too late.  Summary judgment should be granted in favor of Defendant Hewitt.

## 3.    Eighth Amendment claim

The Constitution requires that prison officials must "take reasonable measures to guarantee the safety of the inmates." Hudson v. Palmer, 468 U.S. 517, 526-527, 104 S. Ct. 3194, 3200, 82 L. Ed. 2d 393 (1984) (quoted

---

[13] None of the parties addressed the sufficiency of this claim.

Case No. 4:17cv301-RH-MAF

in Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L.Ed.

2d 811 (1994)).  "A prison official violates the Eighth Amendment when a

substantial risk of serious harm, of which the official is subjectively aware,

exists and the official does not respond reasonably to the risk."  Caldwell v.

Warden, FCI Talladega, 748 F.3d 1090, 1099 (11th Cir. 2014) (quoted in

Brooks v. Warden, 800 F.3d 1295, 1300 (11th Cir. 2015)).

"To prevail on such a claim brought under § 1983, the plaintiff must

show: (1) a substantial risk of serious harm; (2) the defendants' deliberate

indifference to that risk; and (3) a causal connection between the

defendants' conduct and the Eighth Amendment violation."  Brooks, 800

F.3d at 1300.  The first element, a substantial risk of serious harm, is

evaluated using an objective standard.  Id.  "There must be a 'strong

likelihood' of injury, 'rather than a mere possibility,' before an official's

failure to act can constitute deliberate indifference."  Brooks, 800 F.3d at

1301 (citing to Brown v. Hughes, 894 F.2d 1533, 1537 (11th Cir.1990) (per

curiam) (quoting Edwards v. Gilbert, 867 F.2d 1271, 1276 (11th Cir.

1989))).  The third element, a causal connection, requires considering

"whether an official's acts or omissions were the cause—not merely a

contributing factor—of the constitutionally infirm condition." LaMarca v. Turner, 995 F.2d 1526, 1538 (11th Cir. 1993); see also Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 617 (11th Cir. 2007). "The wrong in Eighth Amendment cases is the deliberate indifference to a constitutionally infirm condition; that wrong must, in turn, have been the proximate cause of the plaintiffs' injuries, here the injuries brought about by the assaults." LaMarca, 995 F.2d at 1538-39.

A prison official cannot "escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." Farmer v. Brennan, 511 U.S. 825, 843, 114 S. Ct. 1970, 1982, 128 L. Ed. 2d 811 (1994) (noting "it does not matter whether the risk comes from a single source or multiple sources").

The remaining Defendants (Carter, Chisolm, and Langston) assert that Plaintiff has failed to prove a constitutional violation. ECF No. 75 at 13. Defendants point out that "Plaintiff voluntarily participated in the May

26, 2016[,] altercation and was found guilty of fighting after pleading no

contest." *Id.* at 14.  That assertion is not entirely correct.

Plaintiff's evidence was that he was directed into the restroom by

several inmates and then surrounded.  He was shoved against the wall and

threatened.  Plaintiff reacted to that incident "instinctively" and an

altercation erupted.  It is not necessarily clear from those facts that Plaintiff

"voluntarily" engaged in a fight.  It is not clear that he did so willingly, at

least in the usual sense of the word.

What is clear, however, is that the fight erupted suddenly and without

warning.  No evidence has been presented to show that any Defendant

was on notice prior to that incident that Plaintiff was in danger.  Defendants

cannot be liable for failing to protect Plaintiff from harm in May 2016.

Nonetheless, Defendants Carter, Langston, and Chisholm do

acknowledge that they were "aware of danger to Plaintiff from the inmates

involved in the May 26, 2016," incident.  *Id.*  Based on subsequent events

which transpired after that fight, Defendants were made aware that Plaintiff

faced a risk of harm.  That fact is not disputed.

However, Defendants point out that Plaintiff had alleged in his complaint that he was in danger from inmates belonging to "the Beast Mode Gang." ECF No. 75 at 14 (citing to ECF No. 20 at 2). Plaintiff alleged that he "requested protection from the attackers, as well as anyone associated with the attackers." ECF No. 20 at 4. He requested that Defendant Carter protect him from "the same gang members and their associates." *Id.* Additionally, while in administrative confinement, Plaintiff alleged that he "received several credible threats from members of the 'Beast Mode gang' and their associates." *Id.* at 5. He alleged telling Defendants Chisholm and Langston that he had been threatened in confinement by the same gang members with whom he had previously had an altercation. *Id.*

Beyond Plaintiff's allegations, the evidence reveals that Plaintiff twice told Defendant Carter that he feared for his safety from the "inmate gang" and requested protection. Furthermore, Plaintiff's witness form which gave notice of his safety concerns to Defendants Chisholm and Langston[14] only

---

[14] Defendants argue that Plaintiff would not have made a verbal statement to Defendants Langston and Chisolm at the disciplinary hearing because Plaintiff entered a "no contest" plea. ECF No. 75 at 15. Defendants contend that because such a plea is treated as a guilty plea, no evidence would have been heard. *Id.* That argument is

expressed concern about the "five dudes"[15] which whom he had the May

altercation.  There has been no evidence presented which reveals Plaintiff

told any prison official that was concerned about, or needed protection

from, any other identifiable group of inmates.

Plaintiff's subsequent altercations on July 8, 2016, involved

completely different inmates than those who were involved in the May 26,

2016, incident.  No evidence has been provided to show Defendants were

on notice that Plaintiff faced danger from inmates Jacques or Holybrice, or

---

unsupported by evidence that Plaintiff did not make a verbal request to the Defendants.
Defendants cite to Rule 33-601.307 as support, stating that the first item addressed in a
hearing is the inmate's plea.  ECF No. 75 at 15.  Yet review of that Rule indicates that
the "inmate charged shall be present at the disciplinary hearing" unless he waives that
right or refuses to be present, or a medical issue precludes his presence.  FLA. ADMIN.
CODE R. 33-601.307(1)(b).  Here, the evidence reveals Plaintiff attended the hearing.
ECF No. 75-3 at 1.  The Rule also specifies that the hearing begins with a disciplinary
team member reading the charge to the inmate, ensuring he understands the charge,
asking whether staff assistance is needed, reading the statement of facts supporting the
charge, and finally, asking the inmate's plea.  FLA. ADMIN. CODE R. 33-601.307(c)-(f).
Although the Rule clearly states that "[a] 'no contest' plea shall be handled as a guilty
plea," it otherwise provides that "[i]f the inmate pleads 'guilty,' no further evidence needs
to be heard."  FLA. ADMIN. CODE R. 33-601.307(g).  While that may indicate no further
*evidence* was presented at the hearing, it does not demonstrate that Plaintiff did not
answer Defendant Chisholm's question about whether Plaintiff still wanted protection.
Plaintiff's declaration provides evidence of that brief conversation.  ECF No. 89 at 5.

[15] The Court is not concerned with the fact that Plaintiff's disciplinary witness form did
not specifically identify the "five dudes" which whom he had an altercation on May 26,
2016.  ECF No. 80 at 13.  The investigation into the disciplinary report would have
revealed their identities.

Case No. 4:17cv301-RH-MAF

any member of "the Zoe Mafia Family" or that the "Family" was connected

to the "Beast Mode gang."  No evidence has been presented which shows

that Defendants knew of a risk of harm involving the Zoe Mafia Family and

there is nothing in this record to suggest that the risk of harm from Zoe

Mafia Family members was either obvious or well known.

In Murphy v. Turpin, although the plaintiff "requested protection from

certain inmates and that the defendants knew about his request for

protection from his original cellmate, prisoner Neisler, he did not allege that

the defendants had notice that he was in danger from Thomas, the inmate

who attacked him."  Murphy v. Turpin, 159 F. App'x 945, 948 (11th Cir.

2005) (finding the district court did not err in dismissing the failure to protect

claims).  Thus, "because Murphy alleged no facts indicating that any officer

was aware of a substantial risk of serious harm to him from Thomas and

failed to take protective measures, his claim fails."  159 F. App'x at 948.

Here, no evidence was presented which shows that either inmate

Jacques or inmate Holybrice were members of the Beast Mode Gang or

associated with that gang.  There is no evidence that member of "the Zoe

Mafia Family" were connected with that gang either.  Because Plaintiff has

Case No. 4:17cv301-RH-MAF

not presented evidence to support his failure to protect claims, summary judgment should be granted in favor of the Defendants.

In closing, two other points are worth noting.  First, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  <u>Farmer</u>, 511 U.S. at 838, 114 S. Ct. at 1979.  By failing to recognize some additional, extended harm to Plaintiff unrelated to the persons about whom Plaintiff expressed concern, Defendants did not violate Plaintiff's Eighth Amendment right to protection because they did not consciously disregard a risk of harm.

Second, there can be no causal connection between Plaintiff's subsequent injury and these Defendants because the evidence here reveals Plaintiff was not a victim of violence but an aggressor who initiated violence.  The MINS Report noted that the incident took place on July 8th in the "B4 Dorm."  ECF No. 75-7.  Plaintiff was "assigned to B4-214U" and the other two inmates involved in the July incidents were assigned to that dorm.  ECF No. 75-7.  Yet following the May altercation, no other inmate involved in that fight was housed with Plaintiff in the B Dormitory.  ECF No.

75-10.  Moreover, Plaintiff's own evidence is that after he was "cold

cocked" in the dining hall by an unidentified inmate, he returned to his

dormitory to get a shank and retaliated by stabbing inmate Jacques.  He

was the aggressor.  Thus, any failure by the Defendants to take action was

irrelevant and any omission by these Defendants was not the cause of

Plaintiff's subsequent injury 20 minutes later when inmate Holybrice

retaliated against Plaintiff by stabbing him.  In light thereof, Plaintiff has not

demonstrated a basis for his unspecified "common law" claim either.


## RECOMMENDATION

In light of the foregoing, it is respectfully **RECOMMENDED** that

Plaintiff's motion for summary judgment, ECF No. 80, be **DENIED**, and that

Defendants' motion for summary judgment, ECF No. 75, be **GRANTED,**

and judgment entered in Defendants' favor.

**IN CHAMBERS** at Tallahassee, Florida, on August 28, 2020.


 S/    Martin A. Fitzpatrick
**MARTIN A. FITZPATRICK**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2). A copy of the objections shall be served upon all other parties. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b)(2). Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control. If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions. See 11th Cir. Rule 3-1; 28 U.S.C. § 636.